Casey, Oh. J.,
delivered the opinion of the court:
Leo L. Johnson, in 'the year 1862, was a cotton planter, residing in the State of Arkansas, within the insurrectionary lines. He owned a sugar plantation in the parish of Lafourche, in the State of Louisiana, called the “Webster place.” J. W. Burbridge & Co., merchants of New Orleans, had been his factors. He was indebted to them for money and supplies to the amount of $130,000. New Orleans was captured by the combined land and naval forces, under General Butler and Admiral Farragut, respectively, in the latter end of April, 1862. That city was thenceforth during the war occupied by the Union forces, as well as portions of the State of Louisiana.
A few days after the occupation of the city, General Butler issued a proclamation dated May 1,1862, from which the following extracts are made, having relation to some of the matters discussed in this case:
“All persons well disposed toward the Goverment of the United States, who shall renew their oath of allegiance, -will receive the safeguard and protection in their persons.and property of the United States, the violation of which by any person is punishable with death.
“All persons still holding allegiance to the Confederate States will be deemed rebels against the government of the United States, and regarded and treated as enemies thereof.
“All foreigners not naturalized, and claiming allegiance to their respective governments,, and not having- made oath of allegiance to the supposed government of the Confederate States, will be protected in their persons and property as heretofore under the laws of the United States.
“All persons who may heretofore have given their adherence to the supposed government of the Confederate States, or have been in their service, who shall lay down and deliver up their arms, and return to peaceful occupations, and preserve quiet and order, holding no further correspondence nor giving aid and comfort to the enemies of the United States, willnotbe disturbed, either in person or property, pxcept so far, under the orders of the commanding general, as the exigencies of the public service may render necessary.
“The keepers of all public property, whether State, national, or confederate, such as collections of art, libraries, museums, as *653 well as all public buildings, all munitions of war and armed vessels, will at once make full return thereof to these headquarters; all manufacturers of arms and munitions of war will report to these headquarters their kind and places of business.
“All right of property, of whatever kind, will be held inviolate, subject only to the laws of the United States.
“All inhabitants are enjoined to pursue their usual avocations; all shops and places of business and amusement are to be kept open in the accustomed manner, and services to be had in churches and religious houses, as in times of profound peace.”
' On the 9th November, 1862, General Butler caused a general military order, called “ Order 91,” to be issued. In this order, after reciting among other things that the territory west of the Mississippi Biver, lately taken possession of by the United States troops, was mostly occupied by persons disloyal to the United States, and that sales are being made for the purpose of depriving of their right to the confiscation of certain property, &c., he makes the following among other orders:
“ I. That all the property within the district to be known as the ‘District of Lafourche,’ be and are hereby sequestered, and all sales or transfers thereof are forbidden, and will be held invalid.
“ II. The district of Lafourche will comprise all the territory in the State of Louisiana lying west of the Mississippi Biver, except the parishes of Plaquemines and Jefferson.
“III. That Major Joseph M. Bell, provost judge, president; Lieutenant Colonel J. B. Kinsman, aide-de-camp; Captain Fuller, (Seventy-fifth New York Volunteers,) provost marshal of the district, be appointed a commission to take possession of the property in said district, to make an accurate inventory of the same, and gather up and collect all such personal property, and turn over to the proper officers, upon their receipts, such of said property as may be required for the use of the United States Army; to collect together all the other personal property, and bring the same to New Orleans, and cause it to be sold at public auction, to the highest bidders; and, after deducting the necessary expenses of care, collection, and transportation, to hold the proceeds thereof subject to the just claims of loyal citizens and those neutral foreigners who, in good faith, shall appear to be the owners of the same.
“IV. Every loyal citizen or neutral foreigner who shall be found *654 in actual possession and ownership of any property of said district, not having acquired the same by title since the 18th day of September last, may have his property returned or delivered to him without sale, upon establishing his condition to the judgment of the commission.
“ V. All sales made by any person not a loyal citizen or foreign neutral, since the 18th day of September, shall be. held void; and all sales whatever, made with the" intent to deprive the government of its rights of confiscation, will be held void at what time soever made.
“ VI. The commission is authorized to employ, in working the plantation of any person who has remained quietly at his home, ■whether he be loyal or disloyal, the negroes who may be found in said district, or who have, or may hereafter claim, the protection of the United States, upon the terms set forth in the memoranda of a contract heretofore offered to the planters in the parishes of Plaquemines ‘ and St. Bernard, or white labor may be employed, at the election of the commission.
“ VII. The commissioners will cause to be purchased such supplies as may be necessary, and convey them to such convenient depots, as to supply the planters in the making of the crop; which supplies will be charged against the croi> manufactured, and shall constitute a lien thereon.
“VIII. The commissioners are authorized to work, for the account of the United States, such plantations as are deserted by their owners, or are held by disloyal owners, as may seem to them expedient, for the purpose of saving the crops.
“IX. Any persons who have not been actually in arms against the United States since the occupation of New Orleans by its forces, and who shall remain peaceably upon their plantations, affording no aid or comfort to the enemies of the United States, and who shall return to their allegiance, and who shall, by all reasonable methods, aid the United States when called upon, may be empowered by the commission to work their own plantations, to make their own crop, and to retain possession of their own property, except such as is necessary for the military uses of the United States. And to all such persons the commission are authorized to furnish means of transportation for their crops and supplies, at just and equitable prices.
“ X. The commissioners are empowered and authorized to hear, determine, and definitely report upon all questions of the loy *655 alty, disloyalty, or neutrality of tlie various claimants of property within said district; and, further, to report such persons as in their judgment ought to bo recommended by the commanding general to the President for amnesty and pardon, so that they may have their property returned; to the end that all persons that are loyal may suffer as little injury as possible, and that all persons who have been heretofore disloyal may have opportunity now to prove their loyalty, and return to their allegiance, and save their property from confiscation, if such shall be the determination of the government of the United States.
“ By command of Major General Butler.”
General Banks succeeded General Butler in command at New Orleans, and issued the following General Order “No. 108 :”
“All military and civil officers of this department who are engaged in the superintendence of public works of any character, or who have assumed to direct and control private or public property, and all- other persons engaged on such works, or charged with the direction of such property, will report to these headquarters forthwith the character of such works, the number of persons employed, a description of the property held, and the authority upon which proceedings have been based. No claim for compensation for such services will be considered from this date, until such reports have been received at these headquarters.
“ By command of Major General Banks.”
On the 9th day of September, A. D. 1862, the claimant Montgomery entered into the following written agreement with J. W. Burbridge & Co., the alleged agents and factors of Leo L. Johnson.
“ Know all men by these presents, that it has been agreed, and it is hereby agreed, between the undersigned, as follows, to wit: Thomas D. Harris, acting as the attorney in fact of J. W. Burbridge & Co., of this city, the agent of Leo L. Johnson, of the parish of Lafourche, in this State, has sold, and hereby does sell unto Robert H. Montgomery, of tbis city, the following crop, belonging to said Leo L. Johnson, contained in his sugar-house and purgery on his plantation in the parish of Lafourche, near the Lafourche crossing, to wit: 605 hogs- *656 beads of sugar, 700 barrels molasses, and 300 barrels rum, at the following’ prices, to wit: for the sugar at cents per pound, for the molasses at 20 cents per gallon, and for the rum at 50 cents per gallon, the weight and quantity to he determined at the time and upon the delivery thereof in Weio Orleans.
“ The said Montgomery, in consideration of said sales so to him made, has paid, in ready money, the sum of $5,000 to said Harris, attorney in fact, aforesaid, the receipt whereof is hereby acknowledged and accepted as so much on account of the first sugar, molasses, or rum delivered to him, said Montgomery, as aforestated; the balance to be paid by said Montgomery at each future delivery of said sugar, molasses, and rum.
“ Thus agreed, and done in duplicate, at Hew Orleans, this 9th of September, 1862.
“J. W. BURBRIDGE & Co.
“R. H. MONTGOMERY,
“Per THOMAS D. HARRIS,

“ Attorney.

“Witnesses:
“Jon. L. Cavanna.
“J. C. MoAllester.”
At the same time Harris gave to Montgomery the following paper:
“ New Orleans, September 9,1862.
“ The overseer on the plantation of Leo L. Johnson will please ' deliver to the order of Robert H. Montgomery the entire crop of sugar, molasses, and rum contained in the sugar-house and purgeries, &c., on said plantation, the same having been sold to him this day.
“J. W. BURBRIDGE & Co.,
“ Per T. D. HARRIS.”
At the date of this contract and order, the plantation of Leo L. Johnson and the articles sold, including the sugars claimed in this suit, were outside the lines of occupation of the Union Army, and were under insurgent control and so continued until some day in the latter end of October, or beginning of November of the same year.
Under orders “No. 91” this property was seized by the military under General Butler, and shipped to New Orleans. It was delivered over to the quartermaster, and by him was sold. *657 In tbe first lot shipped, there were something over four hundred hogsheads of sugar 5 in the last lot two hundred and seventy-eight. After the sale of this latter lot Montgomery, the claimant, and J. W. Burbridge & Co., applied to this commission for a return of the proceeds of this sugar. The first lot of four hundred and twenty-six hogsheads of sugar not proved and identified, as is alleged, before'this commission, but the commission awarded to Montgomery the net proceeds of the two hundred and seventy-eight hogsheads, amounting to the sum of $22,018 97. This claim is prosecuted for the net proceeds of the balance of the sugar, amounting to over thirty-seven thousand dollars, which it is alleged has been paid into the Treasury of the United States, and this claim is preferred under the act of March 12,1863, for the net proceeds.
Bobert H. Montgomery is a British subject, but has resided at New Orleans, and has been engaged in business there since 1845. He proved that he never gave any aid or comfort to the rebellion or to the persons engaged in it, and that he did nothing inconsistent with his character of a resident neutral.
Upon this state of facts, the special counsel for the United States has interposed the following matters of defence:
1. That the claimant has not shown such a perfected sale of the property to him as gives him the right as an owner to sue for the net proceeds of it, under the act of March 12, 1863.
2. That Leo Johnson, the owner, resided outside the lines of occupation of the United States forces, and that the property bought by the claimant was also so situated at the date of his purchase, and that such purchase and sale was in violation of the non-intercourse laws, and all acts connected therewith were null and void.
3. That the alleged sale to the claimant was null and void, under the act of July 17,1862, because it belonged to a person engaged in the rebellion, or giving aid, countenance, and encouragement to the same. ,
4. That the claim was not preferred to this court within two years after the suppression of the rebellion, and it is therefore barred by the limitation contained in the act of March 12, 1863.
’5. That the claimant is an alien, a British subject, and has not proved that American citizens have the right to sue that government in its own courts, in respect of any claims they may have against the same.
*658 I. A careful examination of tbe agreement between Burbridge & Co. and tbe claimant, admitting tbe riglit and authority of the power to make the sale, satisfies us that no ownership of the property ever vested in Montgomery. The transaction did not constitute a sale, but only an executory contract for a future sale and delivery. If the property in the mean time had perished by fire or flood, it would have been the loss of the vendors and not of the vendee. For, says the express provision of the written agreement, “ the weight and quantity to he determined, at the time and upon the delivery thereof in New Orleans.¶
The rule established by all the leading authorities both in this country and in England is, that where a sale is agreed upon of goods, and anything remains to be done to ascertain the quantity or price, the property in such case does not vest in the buyer until this is done. (Wallace v. Meyer, 6 East. Rep., 614; Rug v. Minet, 11 East. Rep., 210; Withers v. Lyss, 4 Campb., 237; Wallace v. Breeds, 13 East. Rep., 522; Austin v. Craven, 4 Taunt., 644; White v. Wilks, 5 Taunt., 176; Comyn on Cont., 144, 145, and 146; Chitty on Cont., *338; Acraman v. Morrice, 8 C. B., 449; McDonald v. Hewett, 15 Johns., 349; Outwater v. Dodge, 7 Cow., 85; Ward v. Shaw, 7 Mend., 406; Bailey v. Smith, 43 N. H., 141; Henning v. Powell, 33 Miss., 468; Mitchell v. The Commonwealth, 37 Penna. Rep., 187.) There never was any transmutation of the possession, nor was there a time when the vendors could have called upon the claimant to pay any part of the price. Ho advanced five thousand dollars upon the bargain, but we do not think this changes the aspect of the case at all. It was the ordinary case of an advancement to be credited upon the price of the goods, when ascertained by separation, weighing, &c. And until this was done he only had an executory contract for the purchase of the sugars, and not a finished or completed sale. The property remained in Leo Johnson when it was captured. He has made no claim to it; and if he had, he is probably not in a condition to have maintained it. It is satisfactory to know that the claimant has been reimbursed for his advances and expenses, in the sum given him by the military commission, and that he has never paid anything upon the property now claimed. '
It is insisted, however, that a different rule prevails in Louisiana, and that the sale itself, without delivery, changes the property and vests it in the buyer. But this is a misapprehen *659 sion; for tlie civil code of that State, article 2433, provides, “When, goods, produce, or other objects are not sold in a lump, but by weight, by tale, or by measure, the sale is not perfect, inasmuch as the things so sold are at the risk of the seller until they be weighed, counted, or measured; but the buyer may require either the delivery of them or damages, if any be for the same, in case of non-execution of the contract.” Nothing could be more simple, direct, and explicit than this provision. ' Nor could anything be more opposite to the present discussion, or fit more exactly to the fact of this case. Here was a sale by the pound of these sugars. The weight had not been ascertained, nor had they been delivered. And it is perfectly apparent that the weighing and delivery were essential to a change of the property. It is supposed that the order given by Harris to the overseer on the plantation, to deliver to Montgomery all the sugar, &c., was equivalent to delivery itself. But giving the utmost effect to the order from Harris to the overseer, it was merely substituting the plantation for New Orleans. And it is very clear that no transfer or delivery there of the keys, or possession of the storehouses and purgeries, ever were made to Montgomery, or that he or any agent of his ever saw the sugars there, much less had them weighed or delivered over to them.
The decision in Campbell v. Penn (7 La. An. Rep., 371) is made upon this article Of the code, and shows that the rule of the common law in all its length and breadth prevails in that State. That was a sale of cotton. A part of it had been weighed and .delivered by the broker to the vendee, but the rest had not passed the scales when the vendee absconded. It was held-there was no delivery of the part not weighed. And it was held that the delivery of part of a divisible thing is a delivery of that part alone, not of the whole. And also that actual delivery of the whole in bloelc completes the sale, though the article be not counted, weighed, nor measured. But it will be seen that it must not be a constructive or symbolical delivery, such as is set up here, but an actual change of possession, (Parmele v. McLaughlin, 9 La. Rep., 439.) So, again, “ In a sale by tale, the things when delivered to the vendee are his property, though at the vendor’s risk till counted.” (Shuff v. Morgan, 9 M., 592.) “ The price payable only after possession, which is alleged but not proved, cannot be recovered.” (Wilson v. Phillips, 4 An. La. *660 Rep., 158.”) Liketbe common law, tbe civil code of Louisiana, and the decisions of her highest courts, regard with suspicion and hold fraudulent, or, as they express it, simulated, as to third persons, all sales of movables, when the seller remains in possession of them after the alleged sale. (La. Code, arts. 1915 and 2456; 6 La. Rep., 538; 4 Ibid., 340; 7 An. Rep., 614; 6 An., 250, 438, 710, and 745; 9 An., 278; 17 La., 353; 12 Martin, 254.) But it is unnecessary to multiply authorities upon this point. The same doctrine prevails in Louisiana on this subject that obtains in almost every other civilized community; that in a sale of personal property, or, as they call it, of movables, and anything remains to be done by the parties to ascertain the quantity or price, and where there has been no actual delivery of the property or change of possession, the title and property in the thing do not pass under the agreement of sale. If we are right in this view of the law, there must necessarily be an end of this case, for there was no such delivery or anything in lieu of it, as was required to vest the right to and property in the thing sold in Montgomery, the claimant.
II. Another objection to the claimant’s recovery is interposed by the special counsel, on the ground that the alleged sale of the property in question was a violation of the non-intercourse laws, and therefore illegal and void. At the time of this alleged sale in September, 1862, New Orleans, where Burbridge & Go. and the claimant lived, were within the lines of Union occupation. Lafourche Crossing, where the property was, and that part of Arkansas where Leo L. Johnson, the owner, then lived, were in the territory held and occupied by the insurgent forces. In the absence of all proof to the contrary, the law presumes Leo L. Johnson, the owner, to be disloyal. And being so, all his estate and property was liable to seizure and confiscation under the act of 17th July, 1862. And it Avas not possible for his agent at New Orleans to sell this property to a person within the Union lines, so as to defeat the right of the United States bj»- capture and confiscation, the oAvner and the property both at the time being within the insurgent lines. If this could be done at all, it must be by a mere agreement, and which was incapable of being executed by an actual delivery of the property. To find that there was a transfer or transmutation of the right and title in this property to Montgomery, we are compelled to hold that this mere agreement' *661 effected wbat it was impossible for the parties actually to accomplish; that there was a constructive and potential delivery, when the circumstances and situation of the parties precluded both the possibility and legality of an actual one. The non-intercourse acts declared all trading’, trafficking, and intercourse with the insurgents illegal, -and rendered all property passing to or from the rebel territory liable to capture and condemnation. To hold valid such a transfer as the one set up here, would render all non-intercourse laws nugatory, and make them the sport, or scorn of all who wished to violate or evade their provisions. We cannot doubt that if the parties had agreed in the most direct and explicit terms that the agreement should operate an immediate change of possession and title, that it would have been unavailing for that purpose. We are of opinion that the agreement was inoperative on this ground. (See United States v. Lane, United States v. Filor, and United States v. Anderson et al., Supreme Court.)
III. The third ground of defence is that the alleged sale was void under the act of July 17,1862, as belonging to a person engaged in rebellion. W e do not sustain this point in the broad and general manner in which it is stated; we think the sale, under the circumstances, ivas void by reason of the non-intercourse laws, rather than under the confiscation act of July 17, 1862.
IY. The fourth ground of defence is, that the claim was not preferred to this court within two years after the suppression of the rebellion, and therefore barred by the limitation of two years in the act of March 12,1863.
The suit was brought before the 20th August, 1868, and was therefore not barred by the limitation. This ruling in the case of Anderson v. United States, Grossmayer v. same, and other cases, has recently been affirmed by the Supreme Court of the United States. And this defence is therefore unavailing.
The right of J. W. Burbridge & Co. to.mate this sale to Montgomery rests alone upon the testimony of Thos. D. Harris and J. W. Burbridge. The latter being clearly interested in the event of the suit, his testimony must be excluded. It leaves Harris the only witness to support this authority. He says, “ J. W. Burbridge & Co. were the factors of Leo L. Johnson, and had authority to sell his crops, and apply the proceeds to liquidate his indebtedness to them.” He does not say how he learned this fact, whether from *662 Johnson or Bnrbridge. He does not pretend that he was present and heard Johnson give such instructions to Burbridge & Co., or whether he learned it from their books or from letters of Leo L. Johnson, or simply from the declaration of his employers, J. W. Burbridge & Co. As this is the foundation of the whole case, and was a matter of concern to Burbridge & Co. of one hundred and thirty thousand dollars, it appears strange, if .not incredible, that it should be incapable of more complete, definite, and satisfactory proof. Judging by the usual course of business, it appears impossible that transactions to such an amount, and of the alleged magnitude, covering probably some years of time, should not be capable of more full and clear development. It is strange that there should be no letters, no interviews, no declarations by Leo L. Johnson referring to the subject and recognizing the right of these alleged factors to act in this capacity, and to sell this large amount of property. Another circumstance casts suspicion upon this transaction in my judgment, and that is, that neither of the. subscribing witnesses to this alleged agreement of sale by the agent of an agent to Montgomery, is called, nof is it shown that they are dead or could not be found after proper inquiry. All these circumstances and omissions cast suspicion over this case. As presented before us, it is without any legal or equitable claim to the favorable consideration of a court. But whatever authority was conferred by Leo L. Johnson on Burbridge & Go., even if there were full and adequate proof of it as claimed, was given while New Orleans and La Fourche were both within the rebel lines, and the factor and principal both resided under insurgent sway. When New Orleans was captured by the Union forces, and became part of the Union territory, and the owner and property were within the unreclaimed rebel territory, the power and agency conferred were abrogated, or at least suspended; and while that condition of things continued it was incompetent and wholly illegal for Burbridge & Co. to exercise by virtue of it any power, authority, or control over property within the liues guarded by insurgent bayonets. And therefore, if even there were'full proof of the agency and of the attempted sale, it would, in our opinion, still be unavailing to transfer this property so as to defeat the United States’ right of capture and condemnation. It has been pressed upon our consideration with great earnestness and ability by the learned *663 counsel of the claimant, that as agents and factors who had advanced money to make this crop, Burbridge & Co., in addition to being factors and agents, had a lien or privilege on this property by the law of Louisiana, to be paid their advancements, and that, iu consequence, they had such special property in these sugars as authorized them to sell. But this is a total misapprehension of the law of lien or privilege, as it is there called, and as it exists in that State. In the first place, it does not affect the right or title of the owner in, or his power over, the property; it does not give the holder of the privilege any right or title in or to the property. But it is a- mere preference of payment in case of the death or insolvency of the debtor— out of the property. And even that preference or privilege is held subject to those which the Code gives a prior privilege. Thus the Code, art. 3168, gives the following debts a privilege in their order, upon all the movables of a debt or or decedent, as follows: i, funeral charges; 2, law charges; 3, charges incurred in last sickness of a decedent; 4, wages of servants for past year; 5, supplies to the debtor or his family incurred to retail dealers for the last six months; 6, the salaries; 7, dotal rights due to wives, &c.
By art. 3184, certain debts are privileged on certain movables, among which are—
1. “The appointments of salaries of the overseer for the year last i->ast, and so much as is due of the current year on the product of the last crop, and the crop at present in the ground.”
Then it was enacted—
“ Stat. 23 March, 1843, p. 44, § 1 — Article three thousand one hundred and eighty-four of the civil code be so amended as to insert in the first paragraph after the word ‘overseer’ the following words: ‘and debts due for necessary supplies furnished to any farm or plantation.’ ”
This privilege attaches to the crop of the current year for supplies furnished during that and the preceding year, (Barrett v. Chaler, 2 A., 874.) To make the privilege available, a separate account must be kept with the plantation, and the supplies must be furnished upon the faith of the crop, and with a view to the privilege. Farrar v. Rawley, 3 A. 276. It only includes those supplies essential to the subsistence and management of the jfiantation. Shaw v. Knox, 12 A., 41; Shaw v. Grant, 13 A., 52. Money is not a necessary supply under the code, and does *664 not give a privilege to tbe person advancing it. Shaw v. Grant, 13 A., 52; Hollander v. Creditors, 6 A., 668.
Tims it will we seen that there is not the slightest foundation, in the proofs in this case, upon which to build a lien or privilege upon these crops; for, giving the evidence the widest scope that could possibly be claimed for it in any aspect, and it only shows a general indebtedness of the owner, on a general account. What this balance was for, whether for goods, for money, for supplies, for this or some other plantation, whether for this or some other crop, does not appear in any way by the proofs. And this part of the case has not the least possible basis on which to rest.
The claim as a factor is not any better founded, for by the code, art. 3214, “ every consignee or commission agent, who has made advances on goods consigned to him, or placed in his hands to be sold for account of the consignor, has a privilege for the amount of these advances, with interest and charges, on the value of the goods, if they are at Ms disposal, in Ms stores, or in a public toarehouse, or if, before their arrival, he can show a bill of lading or letter of advice that they have been dispatched to Mm.'”
By a statute in 1841, the factor has a privilege for a general balance against an intervening attaching creditor, provided the goods have been received by him previous to the attachment.
The privilege does not attach until the property on which they are based come into the possession, actual or constructive, of the party claiming the privilege. Hamilton v. Campbell, 9 Ann., 531; Campbell v. Penn, 7 Ann., 371. These citations from the code, and the decisions of the Supreme Court of Louisiana, show that there is as little ground for a factor’s privilege as there is tor that of a creditor who furnished plantation supplies.
But if Burbridge’s testimony be admitted, it will conclusively show that the transaction was understood and acted on, between him and Montgomery, exactly as we say the law holds it to be; as the following extract from his cross examination demonstrates:
“ Q. How much money have you received from B. H. Montgomery since the 9th of September, 1862, and on what account?
*665 “A. I received'$13,181 76, on account of two hundred and seventy-eight hogsheads of sugar taken from the Webster place.
“ Q. Have you received any other moneys from him on account of sugars taken from that plantation f
“A. No.
“ Q. If said Montgomery recovers any moneys from the United States in this suit, do you expect to receive from him any further sum on account of sugars taken from that plantation *1
“A. Yes, sir, I do.”
If this be true, then it is clear that the claimant has no case; that he bought and was to pay for what was delivered, and when it should be so delivered, and for no more; and that he has never paid or advanced any part of the price on the property he now claims, and is under no obligation to pay anything for it, if he does not recover here.
And having already recovered nearly ten thousand dollars more than he paid, out of the proceeds awarded him by the sequestration committee, we cannot see the propriety of his present claim.
The judgment of the court is that the claimant take nothing by his petition, and that the same be dismissed, and the defendants go thereof without day.